**In re L. BEE FURNITURE CO., INC., Debtor.**

**Charles W. Grant, Trustee, Plaintiff,**

**v.**

**Renda Broadcasting Corp., Defendant.**

**Bankruptcy No. 96–1017–BKC–3P7. Adversary No. 96–260.**

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

July 11, 2000.

### *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

GEORGE L. PROCTOR, Chief Judge.

This case came before the Court upon Order of Remand entered by the United States District Court for the Middle District of Florida, Jacksonville Division on March 21, 2000 to determine whether certain preference payments were made in

the ordinary course of the Debtor's business in accordance with 11 U.S.C. § 547(c)(2). After a status conference on April 6, 2000, the Court enters the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT[1]

1. Defendant owns sixteen radio stations, one of which is WEJZ. WEJZ is located in Jacksonville, Florida. (Tr. November 26, 1996 at 9.) Debtor advertised with WEJZ from 1991 to 1996.

2. *Larry Garrett ("Garrett"), general manager and vice-president of WEJZ from June 1991 through November 1996 testified that "[Debtor] has been a long term and strong advertising account on our radio station. In 1993, 1994, and 1995, as an account, [Debtor] would have been one of our top ten billing accounts on the radio station."* (Pl.'s Ex. 1A at 9.)

3. Although the payment terms of Defendant's invoices to Debtor contained payment terms of "thirty days net," Debtor consistently paid its invoices between 90 and 120 days. (Tr. November 26, 1996 at 9–10; Def.'s Ex. 1.) *Garrett and Frank Weatherby ("Weatherby"), general manager of WEJZ since December 1996, testified that Defendant's other customers usually paid between sixty and ninety days, with other customers paying later than ninety days.* (Tr. November 26, 1996 at 9; Tr. September 15, 1998 at 17.)

4. *Garrett also testified that the "window" of payment, the point at which the station pays close attention to a past due account, is ninety days.* (Pl.'s Ex. 1A at 16.)

5. Defendant introduced a Revenue Aging Report ("aging report"), a sum-mary of Defendant's accounts from July 1998, which reflects the following: In July, 1998 approximately 73% of WEJZ's advertising account receivables were still outstanding at thirty days, with approximately 48% and 13% outstanding at sixty and ninety days respectively. During that same time approximately 66% of Defendant's advertising account receivables from fourteen of its radio stations, including WEJZ, were still outstanding at thirty days, with approximately 37% and 20% outstanding at sixty and ninety days respectively.[2] (Def.'s Ex. 1A.)

6. In the spring of 1995, Debtor decided to increase its advertising on Defendant's station, using a theme of liquidation. (Tr. November 26, 1996 at 10–11.) At Debtor's suggestion, Defendant agreed to extend Debtor's advertising credit, provided Debtor did not allow any of the invoices to become outstanding past ninety days. (*Id.* at 11–12.) This policy was reduced to writing on April 3, 1995. (*Id.* at 12, 24; Def.'s Ex. 2.)

7. Under the parties' arrangement, Defendant's business manager would telephone Debtor at the beginning of each month and relate the amount that was in the ninety-day aging category. Debtor, at its discretion, would then divide that amount into installments and issue a series of post-dated checks in like amounts. Defendant would pick up the checks and deposit them as they matured. (Tr. November 26, 1996 at 11–12.). *Garrett testified that he had no other accounts in which the regular course of business was to pick up a series of post-dated checks.* (Pl's Ex. 1A at 18, lines 13–16.) *Weatherby testified that he had not engaged in such a practice at WEJZ, but that on rare occasions in*

---

1. The Court adopts the Findings of Fact as enumerated in its initial decision in *Grant v. Renda Broadcasting Corp. (In re L. Bee Furniture, Co., Inc.),* 204 B.R. 804 (Bankr.M.D.Fla. 1997). Additionally, the Court incorporates therein the evidence from the September 15, 1998 trial on remand (denoted by italics).

2. Weatherby testified that approximately 68% of Defendant's accounts receivables were outstanding at thirty days and 49% were outstanding at sixty days. These figures, however, resulted from an incorrect reading of Defendant's Exhibit 1A and are instead the accounts receivables of KRXO, one of Defendant's stations.

*the past he had done so with a client with whom there was a lot of history.* (Tr. September 15, 1998 at 21–22.)

8. For four months following the agreement, Debtor carried outstanding invoices past 120 days. (Tr. November 26, 1996 at 19–20.) After August 1995 Debtor did not carry a balance past 120 days. (*Id.;* Def.'s Ex. 3.)

9. Following the implementation of this procedure, Debtor forwarded to Defendant multiple series of post-dated checks for past-due invoices. In June 1995, Defendant received two checks for $2,000 each, which were applied against invoice 9511 for February 1995 and invoice 9791 for April 1995. (Tr. November 26, 1996 at 18.) In July 1995 Defendant received two checks for $3,900 each which were applied to April invoice 9791. (Id.) In August 1995 Defendant received one check for $2,478, and one check for $2,006.25, which were applied to invoices 10181 and 10129 for May 1995. (Id.) In September 1995 Defendant received two checks for $3,203.81, and one check for $3,203.83, which were applied to invoice 10339 for June 1995. In October 1995 Defendant received three checks of $3,327.18 each, which were applied to invoice 10535 of July 1995.

10. On February 23, 1996 Debtor filed for relief under Chapter 7 of the Bankruptcy Code, and Plaintiff was appointed as trustee. (Doc. 1.)

11. Plaintiff alleges that within ninety days prior to its bankruptcy filing, Debtor transferred to Defendant the following series of checks, totaling $27,435:

Series A

| Check No. | Amount | Date |
| --- | --- | --- |
| 28752 | $3,600.00 | 11/28/95 |
| 28753 | $3,600.00 | 12/05/95 |
| 28754 | $3,600.00 | 12/06/95 |
| 28755 | $3,675.50 | 12/18/95 |

Series B

| Check No. | Amount | Date |
| --- | --- | --- |
| 29277 | $3,240.00 | 01/10/96 |
| 29278 | $3,240.00 | 01/16/96 |
| 29279 | $3,240.00 | 01/22/96 |
| 29280 | $3,240.00 | 01/30/96 |

(Doc. 1.)

12. The checks in Series A were applied to invoice 10713 of August 1995. (Tr. November 26, 1996 at 14.) The checks in Series B were applied to invoice 107359, 10884, and 10885 of September 1995. (*Id.* at 15.)

13. At trial, Defendant stipulated that all the elements required to establish a preference under 11 U.S.C. § 547(b) had been met, but argued that the transfers were protected from Plaintiff's avoidance powers by the ordinary course of business exception of 11 U.S.C. § 547(c)(2).

14. This Court held that the payments were protected under the ordinary course of business exception of § 547(c)(2) and entered Judgment for the Defendant on January 15, 1997. (Adv.Doc.16.) In so finding, the Court construed all sections of § 547(c)(2) subjectively, focusing on the specific business relationship of the parties rather than industry practices.

15. Plaintiff filed a Notice of Appeal from the Judgment and the proceeding eventually came before the Honorable Harvey E. Schlesinger, United States District Judge, Middle District of Florida, Jacksonville Division (Case No. 97–158–Civ–J–20).

16. Judge Schlesinger reversed and remanded the Judgment entered by this Court for reconsideration and further proceedings (as appropriate), in light of the Eleventh Circuit's decision in *Miller v. Florida Mining and Materials (In re A.W. & Assoc., Inc.),* 136 F.3d 1439 (11th Cir.1998). (Adv.Doc.21.) In *A.W. & Associates* the court found that pursuant to § 547(c)(2)(C) bankruptcy courts are required to examine industry standards. *Id.* at 1442.

17. On September 15, 1998 the Court conducted a trial. The sole issue before the Court was whether Defendant met its

burden of proof on ordinary business terms pursuant to § 547(c)(2)(C).

18. The Court held that the payments were protected under the ordinary course of business exception of § 547(c)(2) and entered Judgment for Defendant on December 21, 1998. (Adv.Doc.30.); *Grant v. Renda Broadcasting Corp. (In re L. Bee Furniture Co., Inc.)*, 227 B.R. 902 (Bankr. M.D.Fla.1998). The Court found that the timing and method of payments made by Debtor to Defendant within the preference period were not consistent with industry standards. However, the Court concluded that the relationship between Debtor and Defendant was long standing and established well before Debtor's slide into bankruptcy. Accordingly, the Court held that Defendant was allowed some leeway from the industry standard and that the timing and method of payment fell within the sliding scale window of industry standards pursuant to § 547(c)(2)(C). The payments were thus not avoidable by the trustee. (Adv.Doc.29.)

19. Plaintiff filed a Notice of Appeal from the Judgment and the proceeding again came before Judge Schlesinger (Case No. 99–53–Civ–J–22).

20. Judge Schlesinger vacated and remanded the Judgment entered by the Court on December 21, 1998 because the accompanying Findings of Fact did not include the substantive evidence that was presented during the supplemental evidentiary hearing held on September 15, 1998. (Adv.Doc.36.)

### CONCLUSIONS OF LAW

Plaintiff asserts that the procedure utilized by Debtor and Defendant to pay delinquent bills was so idiosyncratic as to exclude it from ordinary business terms. Plaintiff argues that not only the age of the debts paid, but the method of payment by post-dated checks was unusual for the industry. Plaintiff points out that this Court, in its prior Findings of Fact and Conclusions of Law, found the procedure to be "unique" and "unusual".

Defendant asserts that the timing of the payments made by Debtor to Defendant was within the standards and practices in the radio advertising industry. Garrett and Weatherby testified that most of Defendant's other customers usually paid between sixty and ninety days, with other customers paying later than ninety days. Defendant also argues that the method of payment (post-dated installment checks) was not "idiosyncratic". Defendant asserts that the method of payment was cemented in long before the Debtor filed bankruptcy.

In *A.W. & Associates* the Eleventh Circuit Court of Appeals endorsed the reasoning of the Seventh Circuit Court of Appeals as set forth in *In re Tolona Pizza Products Corp.*, 3 F.3d 1029 (7th Cir.1993):

'[O]rdinary business terms' refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C.

*A.W. & Assoc.*, 136 F.3d at 1443.

Plaintiff argues that because this Court, in its previous Findings of Facts and Conclusions of Law, (Adv.Doc.15), found the situation between the Defendant and the Debtor to be "unique" and "unusual", this Court must now find the relationship so idiosyncratic that it falls outside the scope of § 547(c)(2)(C).

The Court must attempt to glean a precise definition of industry standards from *A.W. & Associates*, which is unfortunately difficult to do in light of the short shrift given the issue in the opinion. However, the Court looks to the cases relied on by *A.W. & Associates* for guidance.

Not only does the Eleventh Circuit approve of the decision in *Tolona*, but it also cites approvingly to *Fiber Lite Corp. v. Molded Acoustical Products, Inc.*, 18 F.3d

217 (3d Cir.1994). *A.W. & Associates* paraphrases a holding in *Molded Acoustical* parenthetically, signifying its acceptance of the theory applied by the Third Circuit Court of Appeals. *A.W. & Assoc.*, 136 F.3d at 1443 ("finding range of permissible deviation from industry standards determined by extent to which the relationship between the parties is 'cemented' "). The court in *Molded Acoustical* had to determine whether the pattern of the debtor's payments to its preference creditor had changed during the debtor's period of insolvency. As here, the sole issue before the court was the interpretation of § 547(c)(2)(C). The court began its analysis by looking to the legislative history of § 547(c)(2), which revealed that " '[t]he purpose of the exception is to leave undisturbed normal financing relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.' " *Molded Acoustical*, 18 F.3d at 223 (citing *J.P. Fyfe*, 891 F.2d at 70). The court noted its approval of the decision in *Tolona*, however, it embellished the Seventh Circuit's "idiosyncratic" test. *See id.* at 220. The ultimate holding in *Molded Acoustical* evolved through the court's analysis of the purpose of the preference provisions as well as the importance of encouraging creditors to extend credit to their long-term customers when those customers begin to have financial difficulties. *See id.* at 224–25. This analysis led the court to the following conclusion:

> [T]he more cemented (as measured by its duration) the pre-insolvency relationship between the debtor and the creditor, the more the creditor will be allowed to vary its credit terms from the industry norm yet remain within the safe harbor of § 547(c)(2). The likelihood of unfair overreaching by a creditor (to the disadvantage of other creditors) is reduced if the parties sustained the same relationship for a substantial time frame prior to the debtor's insolvency.

*Id.* at 225.

The court acknowledged that its approach in some ways resembled that of subsections (a) and (b) of § 547. *See id.* at 225. However, the court also made sure to point out that even where there is a longstanding relationship, the credit terms may so grossly depart from industry standards that they would be considered unusual. *See id.* at 226.

The United States Court of Appeals for the Fourth Circuit has also adopted *Molded Acoustical's* embellished *Tolona* approach to § 547(c)(2)(C). *See Advo–System, Inc. v. Maxway Corp.*, 37 F.3d 1044 (4th Cir.1994); *Contra Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30 (2d Cir.1996). In *Advo–System* the court characterized the *Molded Acoustical* interpretation of subsection (c) as a "sliding-scale window." 37 F.3d at 1049. The court stressed the importance of the history between the debtor and the creditor prior to the preference period. *See id.* The importance of the lack of any long-term debtor-creditor relationship was also noted, the court finding that an established relationship at least creates a baseline to which the preference period credit terms can be compared. *See id.* The court ultimately concluded that it would follow the approach set forth in *Tolona* as further embellished by *Molded Acoustical*, and also agreed that a gross departure from the industry norm would not suffice even in the presence of an established relationship. *See id.* at 1050.

■ This Court agrees with the Third and Fourth Circuits that the more established the debtor's relationship with a creditor, the more the parties will be permitted to deviate from industry standards. The Court finds that this approach will protect the unusual business relationship between a creditor and its established customers, as well as promote the purpose of the preference section. *See Advo–System*, 37 F.3d at 1050; *Molded Acoustical*, 18

F.3d at 225. Remaining creditors are not injured if the parties were simply continuing a long-standing practice of debt collection. *Advo–System*, 37 F.3d at 1050; *Molded Acoustical*, 18 F.3d at 225. In the absence of over-reaching by a creditor who has an established business relationship with the debtor, the purpose of the preference section, i.e. the equal treatment of creditors, is fulfilled. *Tolona*, 3 F.3d at 1032 ("stating [one] . . . function of the subsection is to allay the concerns of creditors that one or more of their number may have worked out a special deal with the debtor, before the preference period, designed to put that creditor ahead of the other in the event of bankruptcy.")

■ The Court must now determine whether the Debtor and Defendant's practices fall within the sliding scale window of § 547(c)(2)(C) so as to be considered within industry standards. The Court must therefore answer the following questions:

1. What is the industry standard?
2. Does the practice between the parties meet that standard?
3. If so, § 547(c)(2)(C) has been satisfied;
4. If not, look to the history of the parties' relationship and credit practices.
5. If the relationship and practice are not established, the practice falls outside industry standards and fails the test under § 547(c)(2)(C).
6. If the relationship and practice are long-standing and are not gross departures from the industry norm, § 547(c)(2)(C) has been satisfied.

■ Although Defendant's invoices required payment in thirty days, Garrett's and Weatherby's testimony establish that most customers pay within sixty to ninety days, with other customers paying later than ninety days. Garrett also testified that the "window" of payment is ninety days. The Court finds this evidence sufficient to establish an industry norm of payment within the sixty to ninety-day time period.[3]

■ The practice between Debtor and Defendant obviously does not meet this standard. Debtor carried invoices up to and even past 120 days. Therefore the Court must now examine the history of the parties' credit practices.

Debtor first began advertising with WEJZ in 1991 and was one of its top ten billing accounts in 1993, 1994, and 1995. Debtor began its practice of paying amounts within the ninety-day aging category by a series of post-dated checks in April 1995, some ten months prior to filing bankruptcy. The Court finds that Debtor and Defendant had a long-standing, established relationship long before the Debtor's "slide into bankruptcy". Therefore, Defendant is allowed some leeway from the industry standard of payment within sixty to ninety days. The Court believes that given the relationship between the parties, the late payments made by Debtor to Defendant fall within the sliding scale window of industry standards pursuant to § 547(c)(2)(C). Debtor was one of Defendant's valuable customers; long before Debtor filed for bankruptcy Defendant attempted to work with Debtor in order to help it stay in business. There was no overreaching here on behalf of Defendant, rather a legitimate attempt at maintaining a profitable relationship with a long-term customer.

■ The Court's inquiry is not at an end, however. Not only did the Debtor

---

**3.** The July 1998 aging report provides that Defendant had 66% of its accounts receivables outstanding at the thirty day mark versus only 37% still outstanding at the sixty day mark. *See supra* ¶ 5 Findings of Fact. To the extent that the aging report establishes an industry standard, it establishes one of thirty to sixty days. However, the report was for July 1998, a period approximately three years after the period at issue. The Court is more convinced by the testimony of Garrett and Weatherby that most customers pay within sixty to ninety days as well as Garrett's testimony as to the "window of payment." Accordingly, the Court concludes the industry standard is sixty to ninety days.

pay its invoices untimely, but it used a series of post-dated checks to pay its debt in order to keep its invoices within the 120 day mark. Is this method of payment an industry norm?

Testimony from both Garrett and Weatherby established that this method of payment was not the norm. Garrett testified that he had no other accounts in which the regular course was to pick up a series of postdated checks. Weatherby testified that it did not happen on a regular basis and was not ordinary. He also testified that although he had done it in the past, it had been with a client with a lot of history.

The Court has previously determined that the parties had an established relationship as well as an established credit practice. Therefore, so long as the practice is not so idiosyncratic as to fall outside the broad range of industry standards, it falls within the sliding-scale window of the industry norm.

The Court holds that the practice between Debtor and Defendant of issuing a series of post-dated checks is not so idiosyncratic as to fall outside the broad range of industry standards. The relationship between the parties was cemented, therefore the range of permissible deviation from industry standards is much greater than it otherwise would be. *See Molded Acoustical*, 18 F.3d at 225.

The subject credit practices between Debtor and Defendant began 10 months prior to the filing date. This is not a case in which a Defendant approached a debtor in order to harass the debtor and to obtain more favorable terms than another creditor within the preference period. The Court concludes that Defendant legitimately attempted to cooperate with a long-standing customer. The purpose behind the preference section would therefore be defeated were the Court to find the transactions between Debtor and Defendant outside industry standards.

### CONCLUSION

Defendant has proven beyond a preponderance of the evidence that the payments made by Debtor to Defendant within the preference period were made in accordance with industry standards. Defendant has therefore met its burden under each subsection of § 547(c)(2), and the Court holds that the preference period payments qualify as payments made within the ordinary course of business which may not be avoided by the trustee. A separate judgment will be entered in accordance with these Findings of Fact and Conclusions of Law.